UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                            Case No. 8:21-cv-0391-T-VMC-SPF

TOBIAS BACANER, M.D.; TOBIAS &
JILL BACANER REVOCABLE TRUST;
THEODORE FERGUSON, II; PARAGON
COMMUNITY HEALTHCARE, INC.;
COBALT PHARMACY, INC.; and
TIMOTHY FERGUSON,

       Defendants.
_____/

## REPORT AND RECOMMENDATION

Before the Court are Plaintiff United States' Motion for Preliminary Injunction (Doc. 3) and Defendants Theodore Ferguson, Timothy Ferguson, and Paragon Community Healthcare, Inc.'s Response (Doc. 54).   After considering the parties' filings and the arguments and evidence presented to the Court during the three-day evidentiary hearing held on April 26-28, 2021, the undersigned recommends that the United States' motion be denied.

### I.    Procedural Background

On February 19, 2021, the United States sued Defendants under the Controlled Substances Act (CSA), 21 U.S.C. § 801, *et seq.*, and its implementing regulations, 21 C.F.R. § 1301, *et seq.*, for civil monetary penalties and a permanent injunction related to Defendants' operation of a cash-only pain management clinic and retail pharmacy (Doc. 1).  The United States alleges that Defendants violated § 842(a)(1) by dispensing or distributing prescriptions

for controlled substances without a legitimate medical purpose and outside of the usual course of professional practice and § 856 by maintaining a drug-involved premises.[1]

Defendants are board-certified surgeon Tobias Bacaner, M.D. (Bacaner); Paragon Community Healthcare, Inc. (Paragon), the New Port Richey pain clinic where Bacaner worked from 2014 until May 2020; Paragon's owners, brothers Timothy and Theodore Ferguson (the Fergusons); the now-defunct pharmacy that Bacaner and the Fergusons jointly owned, Cobalt Pharmacy, Inc. (Cobalt); and the Tobias & Jill Bacaner Revocable Trust (the Trust), the legal entity through which Bacaner co-owned Cobalt (*Id.*).

The United States contends Bacaner, during his tenure at Paragon and under the watchful eyes of the Ferguson brothers, prescribed "potent and dangerous opioids despite obvious signs of immediate peril to his patients from those drugs[,]" specifically Schedule II controlled substances Methadone, Hydromorphone, and Oxycodone (*Id.* at ¶¶ 3, 21). According to the United States, Bacaner did not craft individualized treatment plans for patients. Instead, Bacaner prescribed high doses and dosage units of opioids to patients without a supporting diagnosis or any attempt to wean them. The United States also alleges Bacaner prescribed patients the Holy Trinity, a combination an opioid, a benzodiazepine, and a muscle relaxer that is "commonly sought by drug abusers" because of the "heroin-like" high it induces (Doc. 3 at 4-5).

---

[1] Section 842 prohibits dispensing or distributing a controlled substance in violation of § 829. 21 U.S.C. § 842. Section 829 makes it unlawful to distribute or dispense a controlled substance without a legitimate medical purpose and outside the usual course of professional practice. 21 U.S.C. § 829. Section 856 prohibits (1) knowingly opening, leasing, renting, using, or maintaining any place for the purpose of unlawfully distributing a controlled substance or (2) managing or controlling any place and knowingly making that place available for use for the purpose of unlawfully distributing a controlled substance. 21 U.S.C. § 856.

Regarding Cobalt, the United States alleges the pharmacy, through Bacaner and the Fergusons, obtained a DEA certificate of registration and began dispensing controlled substances on a cash-only basis in early 2018.  Most of the pharmacy's customers were Bacaner's patients seeking to fill opioid prescriptions.  The United States contends that Cobalt and the Fergusons ignored obvious warning signs of their customers' opioid abuse and filled Bacaner's prescriptions anyway (*see* Doc. 1 at ¶¶ 84-90).

The United States filed its complaint (Doc. 1) and preliminary injunction motion (Doc. 3) on February 19, 2021.  On March 26, 2021, the United States filed proposed stipulated preliminary injunctions with Bacaner, the Trust, and Cobalt, which the district judge approved (Docs. 34-35, 37-38).  The preliminary injunction enjoins Bacaner "from prescribing, dispensing, or distributing controlled substances." (Doc. 34-1 at 2).  To prevent Bacaner from using his DEA prescribing credentials at another clinic or using the legal shelter of the Trust to open or operate another clinic, the preliminary injunction enjoins him from "applying for or seeking renewal of a DEA certificate of registration on behalf of any legal entity; managing, controlling, or operating any legal entity that dispenses, distributes, or administers controlled substances[.]" (*Id.*)  He also must refrain from "altering, destroying, or otherwise disposing of records related to Dr. Bacaner's patients at Paragon Clinic and records of Cobalt Pharmacy." (*Id.*).  Cobalt's stipulated preliminary injunction enjoins it from "altering, destroying, or otherwise disposing" of its records and from re-applying for a DEA certificate of registration. (Doc. 35-1 at 2).

At this juncture, remaining is the United States' request for preliminary injunctive relief against the Fergusons and Paragon, which is still operating as a pain clinic with different prescribing providers.  Until resolution of its claims at trial, the United States asks the Court

to preliminarily enjoin the Fergusons from "applying for or seeking renewal of a DEA certificate of registration on behalf of any legal entity; managing, controlling, or operating any legal entity that dispenses, distributes, or administers controlled substances; altering, destroying, or otherwise disposing of records of Cobalt Pharmacy or Paragon Clinic." (Doc. 3, Ex. 5 at 2). It also seeks to preliminarily enjoin Paragon from "dispensing, distributing, or administering controlled substances; allowing anyone to dispense or distribute controlled substances on the premises of Paragon Clinic; altering, destroying, or otherwise disposing of records of Paragon Community Healthcare, Inc." (*Id.*).

The undersigned convened an evidentiary hearing on the United States' motion from April 26-28, 2021 (*see* Docs. 96-98). Testifying for the United States were expert pain management doctor and anesthesiologist Paul Lynch, M.D.; DEA diversion investigators Mark Biondolino and Richard Albert; Cobalt's pharmacist-in-charge, Mary Carter; and expert pharmacist Thomas Hamilton, Pharm. D. Accountant Mark Harrington and private investigator Jeff Shearer testified for Paragon and the Fergusons.

## II.   Factual Background

The Fergusons incorporated Paragon as a not-for-profit medical clinic in January 2014 and hired Bacaner as an independent contractor (Doc. 91-9 (Biondolino Decl.) at ¶¶ 5-6; Doc. 96 (Day 1 Hr'g Tr.) p. 18, l. 9-12 and p. 48, l. 11). The Fergusons told DEA investigator Biondolino that they started Paragon to provide free or reduced-price medical care to veterans and indigent patients (Biondolino Decl. at ¶ 12; Day 1 Hr'g Tr. p. 32, l. 1-4). The clinic also offers family discounts to patients who live together (Biondolino Decl. at ¶ 12). According to the Fergusons, many of Paragon's patients suffer from chronic pain and other complicated medical problems. Paragon does not accept any medical insurance, its patients all self-pay

4

(Day 1 Hr'g Tr. p. 33, l. 1-3). In 2019, Paragon charged patients $230 for the first visit, $195 for each follow-up appointment, and $25 for urine drug screens (periodically required to obtain new controlled substance prescriptions) (Biondolino Decl. at ¶ 11). The Fergusons run Paragon's daily operations and screen all new patients, discharge existing patients when necessary, and draft the clinic's rules and policies (*Id.* at ¶ 16). Paragon does not accept patients new to opioid treatment, or "opiate naïve." (Day 1 Hr'g Tr. p. 174, l. 19-22). Theodore Ferguson is a former sheriff's deputy, state investigator, and private investigator, and he told DEA investigator Biondolino that he knows how to spot drug-seeking behavior and diversion among the clinic's patients and does a multi-county criminal background investigation on all of Paragon's new patients (Day 1 Hr'g Tr. p. 29, l. 14-23).

Bacaner is a board-certified general surgeon licensed in Florida, Utah, Indiana, and British Columbia (Biondolino Decl. at ¶5; Doc. 91-10). According to data the United States obtained from the Prescription Drug Monitoring Program (PDMP) for Florida, called E-FORCSE,[2] from 2013 to 2019, Bacaner wrote prescriptions for 2,337 patients and prescribed opioids to 96 percent of them (*Id.* at ¶ 24). He prescribed oxycodone the most, writing a total of 18,587 oxycodone prescriptions (*Id.* at ¶ 26). Bacaner typically prescribed 30 days of pain

---

[2] E-FORCSE stands for Electronic-Florida Online Reporting of Controlled Substances Evaluation. It is a state-wide repository of information required under the federal PDMP. Any dispenser of controlled substances (Schedule II through V) must input information into E-FORCSE. The records are patient-specific and are accessible by providers, pharmacists, and law enforcement. E-FORCSE records list a patient's name, date of birth, and address and every controlled substance he or she has been prescribed, the date of the prescription, the prescriber's name, the quantity and dose of medication, the number of days the patient is directed to take the medication, the number of refills, the name of the pharmacy that filled the prescription, and how the patient paid for the medication. Although prescribers and pharmacists can view a patient's E-FORCSE records for the past two years, Biondolino testified that law enforcement has broader access. (*See* Day 1 Hr'g Tr. p. 18, l. 15 – p. 20, l. 23).

medication at a time, and patients could not obtain a refill without another office visit. Sixteen of Bacaner's patients between 2014 and 2019 died of drug overdoses within 40 days of receiving an opioid prescription from him (*Id.* at ¶ 28).

Biondolino began investigating Bacaner in December 2018, based on his review of E-FORCSE records (*Id.* at ¶ 4; Day 1 Hr'g Tr. p. 18, l. 1-3).  In August and December 2019, the DEA served administrative subpoenas for Bacaner's patients' records, and in July 2020, the DEA subpoenaed Cobalt's pharmacy records (Biondolino Decl. at ¶¶ 10, 32, 34).[3]  Bacaner told Biondolino in an August 2019 interview that he aims to decrease a patient's overall dose and dosage units of opioids whenever possible to fall within the CDC's 90 morphine millimeter equivalent (MME) guideline (*Id.* at ¶ 29).  But after culling through Bacaner's patient files, Biondolino identified 12 patients whose records revealed red flags such as Bacaner prescribing them increasing doses (above 90 MME) and dosage units over time, or the patient overdosing (sometimes fatally, either on prescription or street drugs).[4]  He obtained documentation on these patients, including autopsy, toxicology, and police reports where applicable (Day 1 Hr'g Tr. p. 23, l. 20 – p. 25, l. 13; *see* Docs. S-86-89).

Pain management specialist and anesthesiologist Paul Lynch, M.D. provided expert testimony for the United States regarding whether Bacaner complied with the appropriate standard of care when treating patients and prescribing medications (Doc. 91-1 (Lynch Decl.) at ¶ 3).  He reviewed Bacaner's records through 2019, focusing on the 12 patients identified by Biondolino as representative of Bacaner's prescribing practices (Day 1 Hr'g Tr. p. 177, l.

---

[3] Biondolino obtained Bacaner's patient files dating back to 2013, although he did not start at Paragon until 2014.

[4] To maintain their privacy, these patients are identified by their initials as: A.M., C.H., L.D., T.D., W.T., E.O., J.M., M.H., R.W., Z.S., C.M., and T.B.

15-22).[5]  Lynch also reviewed E-FORCSE records; toxicology, autopsy, and police reports (where applicable); and any available imaging for these patients (Lynch Decl. at ¶ 4; Day 1 Hr'g Tr. p. 113, l. 19-25).  In his opinion, Bacaner failed to adhere to the applicable standard of care (Lynch Decl. at ¶ 11).  He did not diagnose his patients with underlying medical conditions that warranted such high levels of opioid use, especially long-term (*Id*. at ¶¶ 11, 14).  He did not order updated objective imaging to confirm his patients' pain complaints and did not follow individualized treatment plans.  And, according to Dr. Lynch, Bacaner continued prescribing opioids to patients despite obvious signs of drug abuse or misuse, such as a patient claiming she needed a new prescription because her medications were lost or stolen, a patient whose urine drug test results were inconsistent with her prescriptions, and a patient with multiple addresses, pharmacies, and doctors listed in E-FORCSE (*Id*. at ¶15).

Under the weight of DEA scrutiny, Paragon and Bacaner parted ways in May 2020. Cobalt's pharmacist-in-charge Mary Carter (who dealt with Bacaner because he co-owned Cobalt and most of his patients filled their prescriptions at Cobalt), testified that the Fergusons "warned Bacaner about his behavior, and they were getting ready to fire him.  And on the day they were going to do that, he resigned." (Doc. 97 (Day 2 Hr'g Tr.) p. 26, l. 7-9).  She recalled that the Fergusons wanted him gone because he was "careless with patients' paperwork.  HIPAA papers would go in the waste basket instead of the shred bin . . . The other thing I recalled is he would be doing his personal work on the computer and letting the patients sit and wait in the waiting room."  (*Id*. at l. 13-17)

---

[5] Dr. Lynch did not review records specific to Paragon, the Fergusons, or any providers at Paragon other than Bacaner, and his review of Bacaner's records stopped in December 2019 (Day 1 Hr'g Tr. p. 178, l. 9-13).  Dr, Lynch's declaration does not include any opinions regarding whether the Fergusons, Paragon, and/or Cobalt complied with a standard of care (Day 1 Hr'g Tr. p. 161, l. 21 – p. 162, l. 12 and p. 171, l. 9-12).

After Bacaner resigned, some of his former patients transferred to newly hired Paragon physicians Drs. Mark Fenzl, Christopher Saputa, or Rashid Saba (*see id.* at p. 26, l. 18-23 and p. 27, l. 2-14).  Lynch and the United States' expert pharmacist Thomas Hamilton testified that in some instances, the patients' prescriptions continued unchanged, and they continued to fill their opioid prescriptions at Cobalt (Day 1 Hr'g Tr. p. 185, l. 25 – p. 187, l. 1; Day 2 Hr'g Tr. p. 88, l. 10-19).  After Bacaner left Paragon, he practiced at a different clinic, where he continued prescribing controlled substances to patients until he stipulated to the preliminary injunction with the United States (*see* Biondolino Decl. at ¶ 36; Doc. 34).

Turning to Cobalt, the Fergusons and Bacaner incorporated it as a non-profit corporation in 2016.  Theo Ferguson told Biondolino in an August 2019 interview that he, his brother Ted, and Bacaner opened Cobalt to provide affordable prescription medications to low-income clients on a cash-only basis.  One of the first things Ted Ferguson did for Cobalt was hire Mary Carter as the pharmacist-in-charge (she testified she got the job by answering Cobalt's Craigslist ad) (Day 2 Hr'g Tr. p. 5, l. 23 – p. 6, l. 2).

Before opening its doors, Cobalt needed a DEA certificate of registration to dispense controlled substances.  This involved applying to the DEA, interviewing with DEA investigator Albert, and viewing a DEA PowerPoint presentation on diversion's red flags (such as patients driving long distances to fill prescriptions, physicians prescribing outside their scope of training or pattern-prescribing, cash-only patients, and customers living at the same address and prescribed the same drug regimen) (Biondolino Decl., Ex. D; Day 1 Hr'g Tr. p. 194, l. 1-14; Day 2 Hr. Tr. p. 13-18).  Cobalt completed this process and obtained a DEA registration number to dispense Schedule II through V controlled substances on February 3, 2017 (Doc. 91-11; Day 1 Hr'g Tr. p. 202, l. 9-10).  Considering the overlapping

ownership of Paragon and Cobalt, DEA investigators warned the Fergusons not to steer Paragon's patients to Cobalt to fill their prescriptions (Biondolino Decl. at ¶ 20; Day 1 Hr'g Tr. at 201, l. 12-15).

Next, Cobalt needed a pharmaceutical distributor to supply it with controlled substances to fill prescriptions.  On a retail pharmacy questionnaire Cobalt submitted to pharmaceutical distributor AmerisourceBergen in October 2017, Ted Ferguson estimated that 20 percent of Cobalt's sales would be from filling prescriptions of controlled substances and that 100 percent of its sales receipts would be credit card payments (Doc. 91-4 at 1-3; Day 2 Hr'g Tr. p. 10, l. 11-14).  The next month, however, Cobalt revised these percentages, estimating that 80 percent of its revenue would come from private insurance companies, 15 percent from Medicare reimbursements, and five percent in cash (Doc. 91-4 at 4-6). AmerisourceBergen agreed to supply Cobalt, and the pharmacy began dispensing controlled substances on March 2, 2018 (Biondolino Decl. at ¶ 21; Day 2 Hr'g Tr. p. 15-22).[6]  Despite these representations about insurance payments, Cobalt never completed the steps to accept private insurance payments; its customers were all cash-only (Day 2 Hr'g Tr. p. 11, l. 3-11 and p. 12, l. 14 – p. 13, l. 4).

By August 2018, according to a letter from Amerisource Bergen, the wholesaler already had "concerns regarding the controlled substance sales" at Cobalt, in particular the high ratio of controlled substances dispensed versus non-controlled substances (55% at that time), the "significant percentage of controlled substance prescriptions (89%) fulfilled at the pharmacy [ ] written by Dr. Tobias Bacaner, who holds partial ownership of [Cobalt,]" and

---

[6] In fact, the first two prescriptions Cobalt filled were written by Bacaner to the Fergusons for opioids (Biondolino Decl. at ¶ 21).

"100% of the controlled substance prescriptions were paid for in cash." (Doc. 91-3 at 1). In fact, between March 2, 2018, and September 8, 2020, Bacaner prescribed 67.98% (a total of 1,526 controlled substance prescriptions) of the total controlled substance prescriptions Cobalt dispensed (Biondolino Decl. at ¶ 22).[7]

Amerisource Bergen suspended its sales of all controlled substances to Cobalt on August 8, 2018, and it stopped supplying Cobalt with non-controlled substances on August 24, 2018 (Day 2 Hr'g Tr. p. 16, l. 13-17; Doc. 91-2). Before its inventory ran out, Cobalt applied to two other drug wholesalers, Independent Pharmacy Cooperative (IPC) and Independent Pharmacy Distributor (IPD) (Day 2 Hr'g Tr. p. 18, l. 14-17). IPC denied Cobalt's application for the same reasons Amerisource Bergen terminated it (*Id.* at p. 18, l. 24 – p. 19, l. 3). IPD approved it and was Cobalt's controlled substances provider until August 2020, when an IPD representative called Mary Carter and terminated Cobalt as a customer over the phone (*Id.* at p. 19, l. 4-6). At that point, Cobalt had enough inventory to fill controlled substance prescriptions for one more month, until September 2020 (*see* Biondolino Decl. at ¶ 37); it sold its last non-controlled substance in November 2020. Cobalt surrendered its DEA registration on January 22, 2021 (about one month before the United States filed this case), and the pharmacy shut down (Day 2 Hr'g Tr. p. 34, l. 7-9).

Hamilton reviewed the PDMP data, patient profiles, and prescription information through December 2020 for the same 12 patients Biondolino and Lynch singled out (Day 2 Hr'g Tr. p. 101, l. 22 – p. 102, l. 1). According to Hamilton, Cobalt had a duty to spot red flags with Bacaner's prescription practices – for example, the high MME doses prescribed

---

[7] In March 2020, Cobalt filled the last of Bacaner's prescriptions (Day 2 Hr'g Tr. p. 88, l. 7-9).

month after month, the monthly refills for immediate-release opioids, the prescriptions for dangerous combinations of controlled substances over a sustained period, the overdoses, and the distance a patient travels from his home address to Cobalt to fill his prescription. Hamilton opined that Cobalt should have identified, documented, and attempted to resolve these red flags but did not (*Id*. at p. 68, l. 15-21).

To summarize, Bacaner stopped working at Paragon in May 2020, yet the Fergusons continue to operate Paragon as a pain clinic with at least three new providers; Bacaner has stipulated to a preliminary injunction with the United States and has agreed to stop prescribing during the pendency of this case; Cobalt is defunct with no DEA registration and no inventory of controlled substances, and it has also agreed to a preliminary injunction restraining it from disposing of documents and re-applying for a DEA certificate of registration; and the Trust is preliminarily enjoined from applying for or seeking renewal of a DEA certificate of registration.   Against this backdrop, the undersigned is tasked with deciding if a preliminary injunction should issue against the Fergusons and Paragon.

## III.   Analysis

A party seeking a preliminary injunction bears the burden of establishing their entitlement to relief.  *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  "A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public

interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court will grant a preliminary injunction only if "the movant clearly establishes the 'burden of persuasion' as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (citations omitted). If a party establishes the right to a preliminary injunction, its scope "must be 'narrowly tailored to fit specific legal violations, because the district court should not impose unnecessary burdens on lawful activity.'" *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (quoting *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999)).

### A. Irreparable Harm

First, the Court turns to whether the United States has established irreparable harm (and whether it needs to). Ordinarily, a plaintiff must demonstrate it is likely to suffer irreparable harm absent a preliminary injunction. *See Winter*, 555 U.S. at 20. Showing irreparable harm is "the *sine qua non* of injunctive relief." *N.E. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted); *see also Great Am. Ins. Co. v. Fountain Eng'g, Inc.*, No. 15-CIV-10068-JLK, 2015 WL 6395283, at *3 (S.D. Fla. Oct. 22, 2015) (showing of irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction"). Demonstrating irreparable harm is not an easy burden to fulfill; the asserted irreparable harm must be "neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation and quotations omitted).

But the United States argues it need not show irreparable harm, that it is presumed when the United States seeks to enjoin the violation of a statute (Doc. 3 at 11). When a party moves to enjoin a violation of a statute, and "the statute was enacted to protect the public interest and itself authorizes injunctive relief, [t]he passage of the statute is in a sense, an implied finding that the violations will harm the public and ought, if necessary, to be restrained." *United States v. Medina*, 718 F.Supp. 928, 930 (S.D. Fla. 1989) (citing *United States v. Diapulse Corp.*, 457 F.2d 25, 27 (2d Cir. 1972)) (enjoining defendant from transmitting radio broadcasts in violation of the Communications Act of 1934, 47 U.S.C. §§ 151-613); *see also United States v. Am. Therapeutic Corp.*, 797 F.Supp.2d 1289, 1291 (S.D. Fla. 2011) (enjoining defendants under 18 U.S.C. § 1345(a) without showing irreparable harm because government offered evidence of health care fraud and danger of recurrent violation). In these cases, showing a likelihood of success on the merits displaces the court's need to assess irreparable harm. Instead, "the requirements for injunctive relief are met when the government establishes that defendants have violated the statute and . . . [there] exists some cognizable danger of recurrent violation." *Medina*, 718 F.Supp. 930 (citation and quotation marks omitted); *see also United States v. Williams*, 476 F. Supp. 2d 1368, 1377 (M.D. Fla. 2007) ("Once illegal activity is clearly demonstrated by a plaintiff under 18 U.S.C. § 1345, the remaining equitable factors of continuing irreparable injury, the balance of hardships to the parties, and the public interest are presumed to weigh in favor of injunctive relief.").

But this is true only in limited circumstances. "If a statute confers a *right* to an injunction once a certain showing is made, no plaintiff – either the government or a private party – need show more than the statute specifies." *United States v. Microsoft Corp.*, 147 F.3d 935, 943 (D.C. Cir. 1998) (emphasis added) (distinguishing Communications Act, 47 U.S.C.

§ 401(b), which provides that a court "shall enforce" FCC order upon showing of disobedience, from Sherman Act, 15 U.S.C. § 4, which authorizes injunctive relief "as shall be deemed just"). Although the statutory specifications supplant traditional equitable considerations, this is "not lightly assume[d]." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). A plaintiff must follow the Supreme Court's directive and show that Congress intended to "intervene and guide or control the exercise of the courts' discretion." *Weinberger*, 456 U.S. at 313.

When a statute authorizes – rather than mandates – injunctive relief, a court should *not* presume irreparable injury and instead must determine that the moving party has established all four elements to grant injunctive relief. *See LAO Bedrossian v. N.W. Mem'l Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005); *Fish v. Kobach*, 840 F.3d 710, 751 n. 24 (10th Cir. 2016). "[U]nless a statute clearly mandates injunctive relief …, the courts are to employ traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief." *Bedrossian*, 409 F.3d at 843 (emphasis added) (citing *Weinberger,* 456 U.S. at 313, 317-18). Only when the statute expressly, "or by a necessary and inescapable inference, restricts the court's jurisdiction in equity" does the court presume a showing of irreparable harm. *Id.* at 842-43. The Eleventh Circuit has endorsed this approach. *See C.B. v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 261 F. App'x 192, 194 (11th Cir. 2008) (refusing to presume irreparable harm where the statute in question provided for, but did not mandate, injunctive relief); *see also Mitsubishi Hitachi Power Sys. Am., Inc. v. Siemens Energy, Inc.*, No. 6:20-cv-1845-Orl-78DCI, 2021 WL 2954416, at *4-5 (M.D. Fla. Jan. 6, 2021) (no presumption of irreparable harm under Defend Trade Secrets Act because statute authorizes but does not mandate injunction; plaintiff did not show irreparable harm where defendant ceased alleged conduct, took

14

remedial measures, and plaintiff could not show likelihood of recurrence); *but see Ala.-Tombigbee Rivers Coalition v. Dept. of Interior*, 26 F.3d 1103, 1106-07 (11th Cir. 1994) (affirming district court's grant of injunctive relief without applying traditional four-factor test under Rule 65 where defendant violated Federal Advisory Committee Act and statute's purpose would be eviscerated without injunction).

Here, the United States seeks injunctive relief under the CSA, 21 U.S.C. §§ 843(f), 882(a), Rule 65, and Local Rule 6.02, M.D. Fla., to prohibit the Fergusons from "applying for or seeking a DEA certificate of registration on behalf of any legal entity; managing controlling, or operating any legal entity that dispenses, distributes, or administers controlled substances; [and] altering, destroying, or otherwise disposing of records of Cobalt Pharmacy or Paragon Clinic." (Doc. 3-5 at 2).  And the United States seeks to enjoin Paragon from "dispensing, distributing, or administering controlled substances; allowing anyone to dispense or distribute controlled substances on the premises of Paragon Clinic; altering, destroying, or otherwise disposing of records of Paragon Community Healthcare, Inc." (*Id.*).

The CSA creates a "comprehensive, closed regulatory regime," making it unlawful to manufacture, distribute, dispense, or possess controlled substances except in the manner authorized by the CSA.  *Gonzales v. Oregon*, 546 U.S. 243, 250 (2006).  The main objectives of the CSA are to conquer drug abuse and control the legitimate and illegitimate traffic in controlled substances.  *Gonzales v. Raich*, 545 U.S. 1, 12 (2005).  In passing the CSA, Congress was concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.  *Id.* at 12-13.  To achieve this legislative intent, the CSA authorizes injunctions in civil cases.  It provides: "In addition to any penalty provided in this section, the Attorney General is authorized to commence a civil action for appropriate declaratory or injunctive

15

relief." 21 U.S.C. § 843(f)(1).  And the CSA states that any injunction "shall be tailored to restrain the violation of . . . section 842." 21 U.S.C. § 843(f)(3).

"This is plainly permissive language that authorizes, but does not require, injunctive relief." *See United States v. Greenwood*, No. 2:19-cv-249, 2019 WL 3717679, at * 2 (D. Utah Aug. 7, 2019).  The court is not limited to enjoining violations of the Act but "may issue injunctions that more broadly restrict the defendant's conduct to eliminate the likelihood that he or she will continue to distribute controlled substances in violation of the [CSA]." *See United States v. Salcedo*, 2003 WL 21196843, at *2 (E.D. N.Y. Feb. 19, 2003) (entering permanent injunction restraining physician from prescribing medicine and awarding civil monetary penalties when doctor absconded).  And the CSA does not authorize *only* equitable remedies in civil cases; it authorizes monetary penalties.  *Cf. First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1142 (10th Cir. 2017) (applying four-part test under Rule 65 because statute did not provide for equitable remedies only).  The United States' inference that injunctive relief is *required* to accomplish the CSA's goals is not "necessary and inescapable." *See Bedrossian*, 409 F.3d at 844.

In this case the court may grant injunctive relief but not without Plaintiff's showing of irreparable harm.  *Greenwood*, 2019 WL 3717679, at * 2 (denying United States' preliminary injunction motion under the CSA because its argument and evidence focused on whether doctor violated CSA and danger of recurrent violation existed, but government did not address other elements of Rule 65).  Unfortunately for the United States, without this presumption the record fails to establish irreparable harm.

The government focuses on demonstrating that Bacaner – not the current Paragon providers, who stand to have their livelihoods extinguished and their reputations tarnished by

an injunction – violated the CSA (*see* Doc. 3 at 2-7).   But preliminary injunctions already restrain the behavior of Bacaner, Cobalt, and the Trust (Docs. 37-38).   The government's medical expert, Lynch, did not offer an opinion regarding the Fergusons,[8] Paragon, the Trust, or Cobalt (Day 1 Hr'g Tr. p. 171, 9-12).   Instead, Lynch formed his expert opinion after reviewing Bacaner's patient files through December 2019 (Day 1 Hr'g Tr. p. 178, l. 5-16 and p. 63, l. 8-14).   Lynch reviewed no patient files for any other Paragon provider (Day 1 Hr'g Tr. p. 164, l. 4-24 and p. 166, l. 16-20).

The question left unanswered is whether the harm caused by Paragon during Bacaner's tenure ended with his departure from the clinic in May 2020, or whether Paragon continues to employ doctors who prescribe controlled substances without legitimate medical reasons. According to Lynch, pharmacy records through mid-2020 revealed that some of Bacaner's former patients were continued on the same medication regimen by Paragon's new physicians (*see* Day 1 Hr'g Tr. p. 185, l. 25 – p. 187, l. 7).   But Lynch did not review the records of the three new physicians whom Paragon partnered with after Bacaner.   He does not know whether those patients had a change in circumstance during intervening months or even what information was considered by the new physicians when making those prescribing decisions. Instead, he is left to postulate that Paragon's new physicians may have been prescribing outside the standard of care because Bacaner did.   This is too big a leap in logic under the circumstances and is inadequate evidence of "actual and imminent" harm.   *Siegel*, 234 F.3d at 1176.

---

[8] In fact, Lynch testified he did not know who the Fergusons were and did not know how they were connected to Paragon until the evidentiary hearing in this case (Day 1 Hr'g Tr. p. 161, l. 17-20).

Regarding the Fergusons' operation of Cobalt, the pharmacy is shut down, it does not have inventory or a supplier, it has no employees or a pharmacist-in-charge, and it does not have a DEA certificate of registration.  In fact, Cobalt itself has stipulated to an injunction that prevents it from re-applying to the DEA (Doc. 38).  The United States argues that an injunction is warranted against the Fergusons because, during the pendency of this litigation, the brothers could conceivably re-open a pharmacy under a new name, hire another pharmacist-in-charge, convince a pharmaceutical wholesaler to supply them with controlled substances, and re-apply for (and obtain) a DEA certificate of registration.  But it offers no evidence that the Fergusons are considering these actions or are likely to accomplish them.  It offers instead an unsupported forecast of events, which falls short.

To recap, the Court will not presume irreparable harm because the CSA does not mandate injunctive relief.  Absent this presumption, the United States must demonstrate irreparable harm that is "neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176.  The United States offers insufficient evidence to carry this burden as to the Fergusons and Paragon.[9]  "[F]ailure to establish irreparable injury 'would, standing alone,

---

[9] The United States also seeks to enjoin Paragon and the Fergusons from "altering, destroying, or otherwise disposing of records." (Doc. 3-5 at 2).  Paragon and the Fergusons are aware of their duty to preserve evidence, a duty that was triggered when they reasonably anticipated this litigation.  *See S.E. Mech. Serv., Inc. v. Brody*, No. 8:08-cv-1151-T-30EAJ, 2009 WL 2242395, at *3 (M.D. Fla. July 24, 2009).  Once a party files suit or a defendant reasonably anticipates litigation, the defendant "has an obligation to make a conscientious effort to preserve electronically stored information that would be relevant to the dispute." *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *11 (S.D. Fla. Apr. 5, 2011).  It should "suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents." *Id.* (citation and quotations omitted).  The term "relevant documents" here encompasses the definition of "relevance, for purposes of discovery," which is broad. *Id.*  The United States acknowledged as much at the hearing, stating "we felt that a belt and suspenders approach would be appropriate here." (Doc. 98 (Day 3 Hr'g Tr.) p. 112, l. 24-25).  However, the duty to preserve evidence, backed by the court's power to impose sanctions for destroying evidence, is enough

18

make preliminary injunctive relief improper.'" *C.B.*, 261 F. App'x at 193 (quoting *Siegel*, 234 F.3d at 1176).  The United States' motion should be denied.

### B.  Remaining Elements of Injunctive Relief

Although the United States' failure to carry its burden of demonstrating irreparable harm ("the *sine qua non* of injunctive relief," *N.E. Fla. Chapter of the Ass'n of Gen. Contractors*, 896 F.2d at 1285) is fatal to its motion, the Court discusses the remaining preliminary injunction factors.  The second factor is substantial likelihood of success on the merits.  The government presented evidence through December 2019 (as to Paragon's operation during Bacaner's tenure) and through mid-2020 (as to Cobalt).  For this period, the United States established it is likely to succeed on the merits of its CSA case against Defendants.  Regarding the balance of hardships, Paragon's current providers risk losing their livelihood if an injunction issues, and the clinic's patients will need to go elsewhere for treatment.  If an injunction does not issue, on the other hand, patients may overdose on illegally prescribed controlled substances, a fact that would tip the scales heavily for the United States except that the government did not present sufficient evidence that Paragon's new providers are violating the CSA.  Considering the evidence before the Court, this element favors the Fergusons and Paragon.  Finally, an injunction is not against the public's interest – this element favors the United States.

---

in this case to secure the preservation of relevant evidence.  The United States' request for a preliminary injunction regarding document retention should be denied.

## IV.    Conclusion

It is recommended:

**(1)**    Plaintiff's motion for preliminary injunction (Doc. 3) be **DENIED.**

**IT IS SO REPORTED** at Tampa, Florida on August 3, 2021.


SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE


## **NOTICE TO PARTIES**

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to the proposed findings and recommendations or request an extension of time to do so.  28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1.  Failure of any party to timely object under § 636(b)(1) waives that party's right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions in this Report and Recommendation.  11th Cir. R. 3-1.